**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| TIG INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:13cv902-PPS |
| | ) | |
| CITY OF ELKHART, NATIONAL CASUALTY | ) | |
| COMPANY, STEVE REZUTKO, STEVE | ) | |
| AMBROSE, TOM CUTLER, JOHN DOES 1-12, | ) | |
| CHRISTOPHER PARISH, LETISHA GARY, | ) | |
| KYLUP PARISH, KHADIJAH PARISH, | ) | |
| CHRISTOPHER PARISH, JR., and | ) | |
| GLORIA PARISH, | ) | |
| | ) | |
| Defendants. | ) | |
| ---------------------------------------------------------------- | | Consolidated with: |
| GEMINI INSURANCE COMPANY and | ) | |
| SWISS RE INTERNATIONAL SE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 3:13cv992-PPS |
| | ) | |
| NATIONAL CASUALTY COMPANY, | ) | |
| CITY OF ELKHART, STEVE REZUTKO, | ) | |
| CHRISTOPHER PARISH, ST. PAUL FIRE | ) | |
| AND MARINE INSURANCE COMPANY and | ) | |
| NORTHFIELD INSURANCE COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |
| ---------------------------------------------------------------- | | |
| NATIONAL CASUALTY COMPANY, | ) | |
| | ) | |
| Counterclaimant/Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEMINI INSURANCE COMPANY, SWISS RE | ) | |
| INTERNATIONAL SE, ZURICH SPECIAL- | ) | |

TIES LONDON LIMITED, TIG INSURANCE )
COMPANY, ST. PAUL FIRE AND MARINE )
INSURANCE COMPANY,  NORTHFIELD )
INSURANCE COMPANY, SELECTIVE )
INSURANCE COMPANY OF SOUTH )
CAROLINA, MARKEL AMERICAN )
INSURANCE COMPANY, and CLARENDON )
AMERICA INSURANCE COMPANY, )
)
    Counterclaim Defendants and )
    Third-Party Defendants. )

## OPINION AND ORDER

These consolidated cases represent a dispute among insurance companies about

who ends up holding the bag for a five million-dollar settlement of the City of Elkhart's

civil rights liability to Christopher Parish.  The wrongful arrest and prosecution of Mr.

Parish has caused a deluge of litigation.  It began in November 1996, when Parish was

charged with armed robbery and attempted murder based on the report of a home

invasion and shooting of Elkhart, Indiana resident Michael Kershner.  Elkhart Police

Department Detective Steve Rezutko was the principal investigating officer.  Parish was

convicted in June 1998, but in December 2005, an Indiana appellate court overturned the

conviction and ordered a new trial, after which the criminal case was dismissed in

December 2006.  *See Parish v. State of Indiana*, 838 N.E.2d 495 (Ind. App. 2005). Parish

was released from custody in July 2006, after spending eight years in jail.

In September 2007, Parish brought a civil action in federal court asserting federal

and state law claims for relief.  In the first count under 42 U.S.C. §1983, he alleged that

the City of Elkhart and its police had violated his constitutional rights to a fair trial and due process, resulting in Parish's wrongful arrest, prosecution and conviction. In the second count, Parish contended that the city and county were liable under the Indiana Tort Claims Act for false arrest, false imprisonment and intentional infliction of emotional harm. Parish's complaint also alleged that Rezutko falsely implicated him by staging a phony crime scene, fabricating and tampering with evidence, manipulating and coercing witnesses, and giving perjured testimony.

The case against Elkhart and Rezutko proceeded to trial before Judge Lozano. Parish prevailed, but the jury's award of only $73,125 in compensatory damages and $5,000 in punitive damages was "astoundingly low for cases of wrongful conviction." *Parish v. City of Elkhart*, 702 F.3d 997, 999 (7th Cir. 2012). On appeal, the Seventh Circuit affirmed the jury's determination of liability but remanded for a new trial on the issue of damages. *Id.* at 1003. Parish ultimately settled his suit for a total of $5 million, dismissing the civil case in January 2014. At the time the case was settled, the sole remaining claim was that Parish's due process rights were violated by a wrongful conviction.

One of the defendants in this case, National Casualty Company, had issued Elkhart a Law Enforcement Liability policy for the period from 1996 through 2000. The limits of liability under those policies were $1 million. NCC defended Elkhart and Rezutko in the civil case before Judge Lozano but it did so under a reservation of rights.

No other insurer contributed to Elkhart's defense. Ultimately, NCC coughed up the entire $5 million settlement amount plus all of the cost of the defense. This is one of the curious features of this case. Why did NCC pay $5 million when its yearly policy limits were $1 million? When asked at oral argument why NCC would pay $5 million to settle a case where the yearly limits of liability were only $1 million, it had no good answer other than to say that NCC insured Elkhart for five years – hence they forked over $1 million for each policy year. But if there is only one trigger date for insurance coverage (more on that in a moment), this may have been a questionable decision. What is equally perplexing is why the excess insurer for the year 1996 — the crucial year when the majority of the bad deeds were done to Mr. Parish – wasn't sued at all in this case. As we'll soon see, NCC has sued the excess carriers for all other potentially relevant years — 1997 - 2008. Perhaps NCC settled with the excess carrier for the year 1996 or perhaps Elkhart had no excess coverage that year. These questions are somewhat beside the point for our present purposes but they remain a curiosity.

    In this consolidated case, NCC seeks contribution toward the cost of defending the Parish suit and toward the settlement from other insurers who issued policies to Elkhart at various times. This case is greatly complicated by the number of years Mr. Parish's nightmarish odyssey took to resolve and the number of different insurance companies that insured Elkhart during all those years. The simplest way to understand

the intersection between when things happened to Mr. Parish and which company was providing the insurance at the time is through a chart. Here it is:

| Insurer | Type of Insurance | Term | Events |
|---------|-------------------|------|--------|
| National Cas. Company | Primary LEL | 3/1/1996 - 1/1/2001 | Nov. '96 Parish charged |
| **TIG Insurance Co.** | **Excess/Umbrella** | **6/1/1997 - 3/1/2000** | June '98 Parish convicted |
| **Markel Insurance Co.** | **Excess/Umbrella** | **3/1/2000 - 1/1/2001** | |
| Zurich Specialties/ Swiss Re International | Primary LEL | 1/1/2001-1/1/2003 | |
| **Selective Insurance Co.** | **Excess/Umbrella** | **1/1/2001 - 1/1/2005** | |
| Northfield Insurance Co. | Primary LEL | 1/1/2003 - 1/1/2004 | |
| Gemini Insurance Co. | Primary LEL | 1/1/2004 - 1/1/2005 | |
| St. Paul Fire and Marine | Primary LEL | 1/1/2005 - 1/1/2008 | Dec. '06  Criminal case dismissed |
| **Clarendon American Insurance Co.** | **Excess/Umbrella** | **1/1/2005 - 1/1/2008** | Sept. '07  §1983 action filed |

This consolidated litigation involves three separate pleadings:  a first amended complaint by TIG which seeks a declaratory judgment, a counterclaim and third-party complaint by NCC, and an amended complaint by Gemini and Swiss Re also seeking declaratory relief.   Now before me are three motions for judgment on the pleadings – one from TIG Insurance, one from Gemini Insurance Company and Swiss Re

International, and the third from St. Paul Fire and Marine Insurance Company and Northfield Insurance Company, in which Clarendon America Insurance Company has joined. A hearing on the motions was held on May 29, 2015.

**LEGAL STANDARDS**

A motion for judgment on the pleadings is filed under Fed.R.Civ.P. 12(c) but is "governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)." *Lodholtz v. York Risk Services Group, Inc.*, 778 F.3d 635, 639 (7th Cir. 2015). To survive such a motion, the complaint must state a claim that is plausible on its face, when the well-pleaded facts are accepted as true and all inferences are drawn in the non-movant's favor. *ProLink Holdings Corp. v. Federal Ins. Co.*, 688 F.3d 828, 830 (7th Cir. 2012). In evaluating a defendant's motion for judgment on the pleadings, I "must determine whether 'the complaint sets forth facts sufficient to support a cognizable legal theory.'" *Laborers Local 236 v. Walker*, 749 F.3d 628, 632 (7th Cir. 2014), quoting *Scherr v. Marriott Int'l, Inc.*, 703 F.3d 1069, 1073 (7th Cir. 2013).

These standards are generally articulated where a Rule 12(c) motion is brought by a defendant seeking the dismissal of a claim asserted against him. Here the motions are brought by third-party defendants St. Paul, Northfield and Clarendon, but also by declaratory judgment plaintiffs Gemini, Swiss Re and TIG. These latter movants seek not mere dismissal of an opposing pleading but an affirmative judgment in their favor declaring that they had no duty to defend or indemnify Elkhart as to the Parish lawsuit.

6

In this procedural posture, the analysis more closely resembles the summary judgment

standard: "the motion may be helpful in disposing of cases in which there is no

substantive dispute that warrants the litigants and the court proceeding further," and

where "the movant clearly establishes that no material issue of fact remains to be

resolved and that he is entitled to judgment as a matter of law."  Wright & Miller,

*Federal Practice and Procedure: Civil 3d* §1368, p.222-23 (3rd Ed. 2004).  Wright and Miller

further distinguish motions under Rule 12(b) and 12(c):

> The granting of a Rule 12(b) motion typically merely means that the
> plaintiff has failed to satisfy one of the procedural prerequisites for
> asserting his claim for relief.  A motion for judgment on the pleadings,
> however, theoretically is directed towards a determination of the
> substantive merits of the controversy; thus, federal courts are unwilling to
> grant a judgment under Rule 12(c) unless it is clear that the merits of the
> controversy can be fairly and fully decided in this summary manner.

*Id*. at §1369 (p. 259).

There is no dispute that Indiana law governs the construction of the insurance

policies at issue here.  Insurance policies are contracts, and the coverage is created by

the language used to define the policy's scope.  As with other contracts, interpretation

of the terms of an insurance policy is a matter of law for the court to decide.   *Home*

*Federal Savings Bank v. Ticor Title Ins. Co.*, 695 F.3d 725, 729 (7th Cir. 2012); *Cinergy Corp. v.*

*Associated Elec. & Gas Ins. Services, Ltd.*, 865 N.E.2d 571, 574 (Ind. 2007) ("Generally, the

interpretation of an insurance policy presents a question of law[.]").  And if an

insurance contract is ambiguous, the policy should be construed in favor of the insured

so as to further the policy's basic purpose of indemnity. *Erie Insurance Co. v. Sams*, 20

N.E.2d 182, 187-88 (Ind. App. 2014).

An insurer's duty to defend is determined based on the pleading of the claims

against the insured. Where the pleadings "fail to disclose a claim within the coverage

limits or one clearly excluded under the policy, and investigation also reveals the claim

is outside the coverage of the policy," no duty to defend arises. *Trisler v. Indiana Ins.*

*Co.*, 575 N.E.2d 1021, 1023 (Ind.Ct.App. 1991). Under Indiana law, the duty to defend is

broader than the duty to indemnify, such that if there is no duty to defend, there can

also be no duty to indemnify. *Home Federal Savings*, 695 F.3d at 729, citing *Trisler*, 575

N.E.2d at 1023.

## MOTION OF GEMINI AND SWISS RE INTERNATIONAL

Gemini Insurance Company and Swiss Re International SE filed the first of the

three pending motions. In their amended complaint, Gemini and Swiss Re seek a

declaratory judgment that they had no duty to defend or indemnify Elkhart based on

the Law Enforcement Liability policies that Swiss Re's predecessor (Zurich) issued

providing coverage for the period from 2001 through 2003, and Gemini provided for the

year 2004. Both Gemini and Swiss Re were primary carriers for Elkhart during their

respective years. The only remaining defendant to Gemini and Swiss Re's amended

complaint is NCC (who was Elkhart's primary carrier for the years 1996-2001) ,

following the voluntary dismissal of all other defendants in March 2014. [DE 37, 39.]

In their motion, Gemini and Swiss Re contend that they are entitled to a judgment that their policies provide no coverage for Elkhart because, within the meaning of the policies, the "wrongful act(s)" that caused Parish's injury did not "occur during the policy period," and because coverage is defeated by the policies' exclusion for damages arising from fraudulent and dishonest acts.

Swiss Re's Law Enforcement Liability Coverage Form provided that:

> "The Company will pay on behalf of the "insured(s)" all "damages" resulting from a "wrongful act(s)" which arise out of the law enforcement activities.  The "wrongful act(s)" must occur during the policy period and within the "policy territory".

[DE 35-6 at 3; DE 35-7 at 3.]  Gemini's policy contains this coverage provision:

> A.  Insuring Agreement
> 1.  We will pay those sums that the Insured becomes legally obligated to pay as "damages" because of a "wrongful act" arising out of law enforcement activities by or on behalf of the Named Insured as shown in the Declarations provided always that:
> a.  The "wrongful act" is committed or occurs during the policy period, and
> b.  Such "wrongful act" took place in the "coverage territory".

[DE 35-8 at 4.]

Under both the Gemini and Swiss Re policies, coverage is provided for damages resulting from a "wrongful act" occurring during the policy period.   The Swiss Re policies define "wrongful act" as "an actual or alleged error or omission, negligent act, neglect or breach of duty by the 'insured' while conducting law enforcement activities, which result in...'Personal Injury'...."  [DE 35-6 at 6; DE 35-7 at 6.]  The Gemini policy's

definition of "wrongful act" is essentially the same: "an actual or alleged error, omission, act, neglect or breach of duty by the insured while conducting law enforcement activities which result in..."Personal Injury'...." [DE 35-8 at 10.] "Personal Injury" in both Gemini's and Swiss Re's policies is defined to include false arrest, detention or imprisonment, and malicious prosecution, as well as "[v]iolation of civil rights... protected under 42 U.S.C. 1981 et sequentia or State Law." [DE 35-6 at 6; DE 35-7 at 6; *see also* DE 35-8 at 10.]

Boiling all this language down, the coverage under the Swiss Re and Gemini policies is for damages resulting from a "wrongful act" committed during the policy period while conducting law enforcement activities. All the wrongful acts by Elkhart law enforcement that injured Parish occurred before his conviction in 1998, and I readily conclude that the "wrongful acts" within the meaning of the policy were the police misconduct or possibly their culmination in the filing of charges against Parish, all of which occurred before Swiss Re's and Gemini's policy periods began in 2001 and 2004.

Recall that only the wrongful conviction claim remained when Parish settled his §1983 action. If the "wrongful act" in the Gemini and Swiss Re policies is construed to focus on the accrual of the wrongful conviction claim, based on Parish's exoneration by the dismissal of the criminal charges in 2006, that would also place the triggering event outside the policy periods, as the later of the Swiss Re and Gemini policies ended as of January 1, 2005. NCC concedes the point: "if the Court agrees that insurance coverage

10

for Parish's wrongful conviction claim was triggered on the date of exoneration, and no other date, the TIG, Gemini and Swiss Re policies would not be required to contribute to settlement because none were in effect on the date of exoneration." [Id. at 9.]

So the question is what event triggers insurance coverage in a wrongful conviction claim? Is it the date when the bad police behavior occurred and the prosecution was commenced? Or is it the date of exoneration — a date that may be several years down the road as it was in this case — that matters? The answer to these questions is far from clear. This case is governed by Indiana law but I can locate no Indiana case directly on point.

There are two recent Illinois cases that have decided that insurance coverage is triggered in a wrongful prosecution claim under Illinois law when the wrongful prosecution is commenced, not when the defendant is exonerated. *Indian Harbor Ins. Co. v. City of Waukegan*, ___ N.E.3d ___, 2015 WL 995093 at *7 (Ill.App. March 6, 2015); *St. Paul Fire and Marine Ins. Co. v. City of Zion*, 18 N.E.3d 193, 200 (Ill.App. 2014). These cases undermine the rationale of earlier Seventh Circuit cases which, again applying Illinois law, decided that exoneration was the triggering event for a malicious prosecution claim under law enforcement liability coverage. *See Northfield Insurance Co. v. City of Waukegan*, 701 F.3d 1124 (7th Cir. 2012); *American Safety Casualty Ins. Co. v. City of Waukegan*, 678 F.3d 475 (7th Cir. 2012); *National Casualty Co. v. McFatridge*, 604 F.3d 335 (7th Cir. 2010). But all of these Seventh Circuit cases were based on an earlier Illinois case that was later overruled, and the two more recent Illinois cases cited above have

made it clear that the Illinois courts disagree with the Seventh Circuit's view on what Illinois law is in this area. *See St. Paul Fire and Casualty*, 18 N.E. 3d at 201; *Indian Harbor Insurance Co.*, 2015 WL 995093 at 5-6. So as it stands right now, at least under Illinois law, the triggering event for determining insurance coverage in a wrongful prosecution claim is the date the prosecution is initiated.

This is all a bit academic for the motion filed by Swiss Re and Gemini, because, as I noted above, they win no matter which way the law is. Recall that Swiss Re and Gemini's policies ran from 2001 through 2004. The wrongful acts by the police started in 1996 and Mr. Parish was wrongfully convicted in 1998 — well before either Swiss Re or Gemini were insuring the City of Elkhart. And the exoneration of Parish occurred in 2006 — again, well *after* Swiss Re and Gemini's policies lapsed. So whether the Seventh Circuit is correct and exoneration is the date that matters, or whether the more recent Illinois cases are correct and the date the wrongful prosecution was filed is what matters is neither here nor there for our present purposes. Swiss Re and Gemini win either way because their coverage occurred smack dab in the middle of the two dates. So I will grant Swiss Re and Gemini a declaratory judgment on the pleadings to the effect that they bear no share of liability on the Parish settlement. Because it is undisputed that Swiss Re is sued as the assignee of policies originally issued by defendant Zurich Specialties London, Ltd. [DE 70 at 4], Zurich (though unrepresented in this case) is likewise entitled to dismissal.

Swiss Re and Gemini might still be on the hook for the costs of Elkhart's defense if their policies created a duty to defend against the Parish complaint. But even the broader examination of all the Parish complaint's allegations does not support a conclusion that Swiss Re or Gemini had a duty to defend. The facts pled in support of the Indiana tort claims for false arrest and false imprisonment, and theories of federal constitutional violations all are based on law enforcement conduct that took place long before the Swiss Re and Gemini coverage periods (2001, 2002, and 2004). The Indiana tort claim for intentional infliction of emotional distress was found by the Seventh Circuit to have accrued upon Parish's exoneration in December 2006. *Parish v. City of Elkhart*, 614 F.3d 677, 684 (7th Cir. 2010). Even if the December 2006 date is used, the claim did not create an arguable basis for coverage under the Swiss Re and Gemini policies either. It is certainly true that Parish may have suffered emotional distress through the entire period of his incarceration. But coverage under the Swiss Re and Gemini policies turns on when the causative wrongful law enforcement acts occurred, and those preceded (or were) the filing of the charges. So the pertinent focus is on the timing of the law enforcement wrongful conduct, not the resulting harm.

NCC argues unpersuasively that the Parish complaint "allege[s] wrongful acts that occurred during the Gemini and Swiss Re policy periods." [DE 82 at 19.] The most NCC can point to are allegations about Elkhart law enforcement policies that may have continued after Parish's conviction and into the policy periods, but any continuing Elkhart practices did not cause Parish further injury at that point. The argument

"conflates continuing harmful acts with the continuing effects of one harmful act" or earlier harmful acts. *Northfield Ins. Co. v. City of Waukegan*, 701 F.3d 1124, 1133 (7th Cir. 2012). NCC cites no authority to support the existence of the universally-rejected concept of "multiple trigger" liability coverage based on such "continuing" harms. *See Genesis Ins. Co. v. City of Council Bluffs*, 677 F.3d 806, 816 (8th Cir. 2012) (citing several cases and noting that no federal or state court has adopted a multiple trigger theory for liability insurance coverage in a malicious prosecution context).

For all these reasons, I conclude as a matter of law that the Swiss Re and Gemini policies did not create a duty to defend Elkhart or provide liability coverage for settlement of the Parish matter. And since I am granting judgment in favor of Swiss Re and Gemini for the reasons outlined above, I do not need to discuss their alternative argument, namely that coverage is barred under exclusions for "criminal" acts, "acts of fraud" and "dishonest, fraudulent" acts.

## MOTION OF TIG INSURANCE

TIG issued certain excess umbrella insurance policies to Elkhart for the period from June 1, 1997 through March 1, 2000, during which time NCC was Elkhart's primary Law Enforcement Liability carrier. TIG's motion for judgment on the pleadings contends that "the only remaining claim in the Underlying Lawsuit at the time of the settlement does not trigger the TIG Excess Policies," and that the remaining claim did not involve "personal injury" within the meaning of the policies. [DE 79 at 2.]

TIG reasons that at the time of the Parish settlement, the sole remaining claim was for wrongful conviction, and that claim did not accrue until Parish's exoneration in 2006.

Unlike Swiss Re and Gemini's coverage based on "wrongful acts," TIG's excess policy was "occurrence" based. The pertinent portion of the TIG "Coverage" provision provides: "WE will pay on YOUR behalf the sums that YOU shall become legally obligated to pay as damages because of PERSONAL INJURY, PROPERTY DAMAGE, or ADVERTISING INJURY, caused by an OCCURRENCE to which this policy applies during this POLICY PERIOD." [DE 1-1 at 11.] TIG argues that the occurrence in question is Parish's §1983 claim for wrongful conviction, and suggests that the Seventh Circuit found that claim did not accrue until Parish's exoneration in December 2006. *Parish v. City of Elkhart*, 614 F.3d 677, 684 (7th Cir. 2010). But the Seventh Circuit held no such thing. That incarnation of the *Parish* case dealt with accrual of a claim for statute of limitations purposes. It says nothing about what event triggers insurance coverage; these are very different questions.

Surprisingly, in its briefing, NCC appears to agree with TIG: "NCC agrees with the moving insurers to the extent that the appropriate trigger date for determining which insurers' duties of indemnification are triggered is the date of Mr. Parish's exoneration in 2006 and no other date." [DE 82 at 2-3.]. But at oral argument, TIG did an about-face and argued that the trigger date should be much earlier, relying on the more recent Illinois cases discussed above — *Indian Harbor Ins. Co. v. City of Waukegan*, __

_ N.E.3d ___, 2015 WL 995093 at *7 (Ill.App. March 6, 2015), and *St. Paul Fire and Marine Ins. Co. v. City of Zion*, 18 N.E.3d 193, 200 (Ill.App.  2014).

At bottom, I agree with the Illinois Appellate Court, when it said that what really matters in deciding coverage questions is what the individual insurance policy at issue actually says.  In other words, it is the language of the insurance contract that governs coverage, not some blanket judge-made rule. *St. Paul Fire and Marine Insurance v. City of Zion*, 18 N.E.3d 193, 202 (Ill.App. 2014).  To the extent that NCC presumes there must be "a consistent trigger of coverage," it overlooks the necessity of construing each insurance policy and determining its coverage based on its particular language.   [DE 82 at 24.]  What triggers coverage of a certain sort may turn out to be common across different policies of the same type, but cannot be presumed categorically without reference to the applicable policy language.

In TIG's policy, "PERSONAL INJURY" is defined to include "False arrest, detention, imprisonment, or malicious prosecution."  [DE 1-1 at 19.]  "Occurrence" is defined as "an accident including continuous or repeated exposure to substantially the same general harmful conditions." With appropriate definitional substitutions, the TIG policy provides coverage for damages because of malicious prosecution caused by an accident during the policy period.  Let's set aside for the moment the question whether anything in this case can be called an "accident" — an issue no one has raised.[1]  Instead,

---

[1] The Indiana Court of Appeals has recently examined this same definition of occurrence (finding it "typical of commercial liability policies") and equated the terms "occurrence" and "accident" with "happening" or "event."  *Thomson, Inc. v. Insurance*

let's substitute, as TIG does, the accrual of the wrongful conviction claim as the accident or occurrence; then the provision would be said to cover damages because of malicious prosecution caused by the accrual of the wrongful conviction claim during the policy period. But this doesn't make sense – the damage from the malicious prosecution was not "caused by" the accrual of the cause of action. This provides a good example of the importance of parsing the policy language in a sensible manner to determine its scope.

This is where the definition of "occurrence" comes into play. There is a "clear majority" of courts that have held that the "tort of malicious prosecution occurs for insurance coverage purposes… when the underlying criminal charges are filed." *Genesis Ins. Co.*, 677 F.3d at 812-13, applying Iowa law and citing cases applying the law of Missouri, Maryland, New Jersey, California, Illinois, Florida and Pennsylvania. In a case under Pennsylvania law, the Third Circuit explained that reliance on exoneration as a trigger for coverage would have "unwise policy implications, for it allows tortfeasors with information about their own potential liability to shift the burden to unwary insurance companies." *City of Erie* v. *Guaranty Nat'l Ins. Co.*, 109 F.3d 156, 160 (3rd Cir. 1997). With considerable reliance on *Genesis Ins. Co.* and *City of Erie*, and construing a slightly different definition of "occurrence" – "an act or series of acts of the same or similar nature committed during this policy period" – a district court in Ohio has recently determined that "in Ohio the tort of malicious prosecution occurs for the purpose of insurance coverage under an occurrence based policy when criminal charges

_____

*Company of North America*, 11 N.E.3d 982, 1005 (Ind.Ct.App. 2014).

are filed." *Selective Ins. Co. of the Southeast v. RLI Ins. Co.,* 2015 WL 4250364 at *9 (N.D.Ohio July 13, 2015).

Because an "occurrence" under the TIG policies includes "continuous or repeated exposure to substantially the same general harmful conditions," a series of related acts of police misconduct (which would include perjured trial testimony or other misconduct after the false charges are brought) constitutes a single occurrence. This "restrictive" policy definition sweeps into a single occurrence all injuries and damage resulting from one "proximate, uninterrupted and continuing cause," such as here with the malfeasance of Elkhart law enforcement. *Thomson, Inc.*, 11 N.E.3d at 1001-02, 1003-04 (course of illegal dumping of chemicals constitutes one occurrence; the definition of "occurrence" means that continuous or repeated exposure to the same harmful conditions "constitutes a single occurrence"). This approach is also consistent with the "general rule under Indiana law," namely that "'[t]he time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged.'" *Huntzinger v. Hastings Mutual Ins. Co.*, 143 F.3d 302, 315 (7th Cir. 1998), quoting *United States Fidelity & Guar. Co. v. American Ins. Co.*, 345 N.E.2d 267, 270 (Ind.Ct.App. 1976). *See also City of Jasper, Ind. v. Wausau Ins. Companies,* 821 F.Supp. 554, 558 (S.D.Ind. 1990).

In the *Genesis Ins.* case, the Eighth Circuit analyzed the insured's assertion that constitutional claims in the nature of malicious prosecution involved allegations of continuing misconduct and continuing injury so as to warrant a "multiple trigger"

18

approach to insurance coverage across multiple liability policy periods. Citing the

Third Circuit's rationale in *City of Erie*, the Eighth Circuit rejected the contention that

malicious prosecution constitutes a continuing injury and found that multiple triggers

are not applicable. *Genesis Ins.*, 677 F.3d at 815-16. "In malicious prosecution cases,

there is no interval between arrest and injury that would allow an insurance company

to terminate coverage. The plaintiff faces incarceration, humiliation, and damage to

reputation as soon as charges are filed. Perhaps for this reason, no federal or state court

has adopted the multiple trigger theory in malicious prosecution cases." *City of Erie*,

109 F.3d at 165. *See also Chicago Ins. Co. and City of Council Bluffs*, 713 F.3d 963, 971 (8th

Cir. 2013) (reaffirming the holding of *Genesis Ins. Co.* and rejecting argument that

multiple triggers apply because injuries spanned the duration of imprisonment). NCC

has cited no authority to the contrary.

I am comfortable with this conclusion despite the existence of Indiana cases

applying a multiple trigger approach in other contexts. *See Allstate Insurance Company v.

Dana Corporation*, 759 N.E.2d 1049 (Ind. 2001); *PSI Energy, Inc. v. Home Insurance

Company*, 801 N.E.2d 705 (Ind.Ct.App. 2004); *Wolf Lake Terminals, Inc. v. Mutual Marine

Ins. Co.*, 433 F.Supp.2d 933 (N.D.Ind. 2005). These cases arise in the context of

environmental contamination, and conclude that under occurrence-based liability

policies, if contamination caused a covered occurrence in one policy period, but

continued causing damage in another, the contamination would trigger both policies.

*E.g. Dana Corporation*, 759 N.E.2d at 1060. Unlike the immediate harm inflicted by false

and malicious criminal charges, injuries due to exposure to toxic chemicals and similar instances of delayed manifestation of damage merit a different analysis and interpretation of the reasonable expectations of the parties to liability insurance policies. The prototypical multiple trigger case is asbestos litigation, where it is recognized that asbestos fibers may be inhaled "through numerous policy periods, the disease may develop during subsequent policy periods, and manifestation may occur in yet another policy period." *Keene Corp. v. Ins. Co. of North America*, 667 F.2d 1034, 1040 (D.C.Cir. 1981). For such liabilities the insured's expectation of coverage against the risk of future liability requires a policy interpretation that "triggers coverage from exposure through manifestation." 4 *Law and Prac. of Ins. Coverage Litig.* §46:21. The same rationale is not applicable to malicious prosecution injuries.

So the "occurrence" here dates to 1996 when Parish was wrongly charged in violation of his due process rights, and quite simply TIG was not Elkhart's insurer at that time. In sum, TIG has demonstrated that its policy created no coverage for the settlement of Parish's §1983 claim because the "occurrence" that caused Parish's injury commenced prior to the policy period.[2]

---

[2] Because I agree with TIG on its first argument, I need not discuss TIG's alternative argument, namely that a §1983 due process claim is not a covered injury because "personal injury" is defined to include false arrest, detention, imprisonment and malicious prosecution, but does not include due process violations based on wrongful conviction.

NCC's pleading seeks contribution not only to the settlement but also to the costs of the defense. TIG's briefing does not discuss the broader duty to defend, although the motion seeks relief in TIG's favor on that issue. NCC's opposition argues several times that Swiss Re and Gemini have a duty to defend but does not similarly expressly argue that TIG does. As always, coverage turns on the policy language, but as a general proposition excess and umbrella policies often disclaim a duty to defend and coverage for defense costs since those are borne by the primary insurer. TIG's umbrella policies do not contain any language that would support liability for defense costs. The "Coverage" section refers only to sums Elkhart "become[s] legally obligated to pay *as damages*." [DE 1-1 at 11 (emphasis added).] The "Limits of Insurance" are stated in terms of the "ultimate net loss," which is defined as "the amount of the principal sum, award or verdict actually paid or payable in cash in the settlement or satisfaction of claims for which the Insured is liable, either by adjudication or compromise." [*Id.* at 11, 20.] This language clearly does not encompass the costs of defense.

Under "Defense Provisions," the policy provides that TIG "shall not be called upon to assume charge of the investigation, settlement or defense of any claim made or suit brought" against the insured. [*Id.* at 12.] In a seemingly redundant move, the TIG policy also contains an endorsement adding the provision that TIG "shall not defend or investigate or effect settlement of any claim or suit which is not covered or is specifically excluded by this policy." [DE 1-1 at 27.] Although TIG retains a right to opt into participation in the defense of any claims it believes might impact it [*id.*], that

option (not exercised here) does not terminate the primary carrier's defense obligation or expose TIG to liability for the primary insurer's costs of defense.

This approach is consistent with what commentators on the matter have said: "Regarding excess insurers, the traditional majority view is that an excess insurer is not required to contribute to the defense expenses as long as any primary insurer still has a duty to defend." 1Robert P. Redemann and Michael F. Smith, Law and Prac. of Ins. Coverage Litig. §4:23 (2015). *See also* 14 Steven Plitt, Daniel Maldonado, Joshua D. Rogers, and Jordan R. Plitt, Couch on Ins. §205.61 (3rd ed. 2015) ("Excess insurers had neither an express nor implied duty to share in the defense costs before exhaustion of the underlying policy limits").

On the record and scant argument before me, I conclude that as an umbrella insurer under this policy language, TIG has no obligation with respect to costs of defense, and the parties, knowing that, have not spent time addressing it. The conclusion is bolstered by the strength of my determination that there is no coverage for the settlement itself because the "occurrence" that caused the injury was not within the policy period. For all these reasons, TIG's motion will be granted as to both Elkhart's settlement liability and the costs of defense.

## MOTION OF ST. PAUL, NORTHFIELD AND CLARENDON

Defendants St. Paul and Northfield have filed a motion for judgment on the pleadings, in which defendant Clarendon has joined. St. Paul was Elkhart's primary Law Enforcement Liability carrier for the years 2005, 2006 and 2007, and Clarendon was

the excess carrier for those same years. Northfield was Elkhart's primary carrier in 2003. St. Paul's policies contained the following provision, in which I have parenthetically inserted in italics relevant additional language from the policy's definition of terms:

> We'll pay amounts any protected person is legally required to pay as damages for covered injury or damage *(caused by wrongful acts of false arrest, detention or imprisonment, malicious prosecution, or civil rights violations)* that:
> * results from law enforcement activities or operations by or for you;
> * happens while this agreement is in effect: and
> * is caused by a wrongful act that is committed while conducting law enforcement activities or operations.

DE 35-18 at 239-240; DE 84 at 4.

Under this language, it is the "covered injury or damage" that must happen during the policy period, rather than the "wrongful acts" which cause the injury. Of course, the wrongful act and the damage can be simultaneous, as I believe they were here. What seems like the most sensible reading of "damage" caused by the wrongful law enforcement acts occurred when Parish was falsely arrested, falsely charged, and falsely convicted. St. Paul had the coverage in 2006 when the charges against Parish were dropped, but is off the hook because the "covered injury or damage" occurred years before when the police falsely implicated Parish and he was convicted at trial.

As for Clarendon, it issued excess policies to Elkhart for calendar years 2005 and 2006, during the period of St. Paul's primary law enforcement liability coverage. [DE 35-16, DE 35-17.] Evidently, Clarendon takes the position that if the court grants relief to

St. Paul, then Clarendon would automatically receive the same declaration of no liability for costs of defense or for contribution to the settlement. This is correct since the coverage under Clarendon's Excess Liability Policy is expressly limited to "injury or damage covered by the underlying insurance," namely St. Paul's LEL policy. [DE 25-16 at 4; DE 25-17 at 4.] Because I conclude that St. Paul's policy provided no coverage for the §1983 claims Parish settled with Elkhart in 2013, Clarendon is likewise without liability.

Northfield's policy, which was in place during 2003, provides (with my italicized parenthetical inserts of additional definitional language) that it "will pay those sums that the insured becomes legally obligated to pay as damages because of a 'wrongful act' which results in 'personal injury' (*arising from false arrest, detention or imprisonment, malicious prosecution*)...in the performance of law enforcement activities...." [DE 35-22 at 11, 14.] Further, the insurance "applies to damages only if the damages...[o]ccur during the policy period." [*Id.* at 11.]

So under Northfield's policy, it is the "damages" that have to occur during the policy period. This language seems to sloppily confuse "damages" with "damage." The term is not defined but the way it is first used ("sums...obligated to pay as damages") sounds like "money damages" and not "damage" as a synonym for injury. (Once again, this is not a point that any party has raised). So the question that needs to be answered is when did Mr. Parish suffer "damages" resulting from the Elkhart cops' misconduct. I think the most sensible reading is that the damages occurred when

Parish was wrongly arrested, charged and tried, all based on that wrongdoing. None of that was going on in 2003 when Northfield's policy was in effect.

All three of these insureds are entitled to judgment as a matter of law concerning the Parish settlement. As I indicated before, NCC's pleading seeks contribution not only to the settlement but also to the costs of Elkhart's defense. Northfield and St. Paul's motion does not address the broader duty to defend. NCC's opposition clearly argues the point, and the movants address it in reply. I conclude that the lack of coverage is sufficiently clear that there is likewise no liability for the costs of defense.

These insurers' policies were in effect years after Parish was charged and convicted, during time periods when he was incarcerated and the state appellate process finally yielded Parish a victory and the dismissal of the charges. Nothing happened during these policy periods that could be the kind of "injury or damage" covered by these policies. The police misconduct had happened years before, as had Parish's trial and sentencing. Even the broader duty to defend is not broad enough to support for these insurers a duty to defend (or to share in the cost of defense) against Parish's civil rights complaint.

ACCORDINGLY:

Gemini Insurance Company and Swiss Re International SE's Motion for Judgment on the Pleadings [DE 69] is GRANTED.

TIG Insurance Company's Motion for Judgment on the Pleadings [DE 79] is GRANTED.

St. Paul Fire and Marine Insurance Company and Northfield Insurance

Company's Motion for Judgment on the Pleadings [DE 83], joined by Clarendon

America Insurance Company [DE 85], is GRANTED.

**SO ORDERED.**

**ENTERED: August 17, 2015**

  /s/ Philip P. Simon
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**